Jasen, J.
(dissenting). I am unable to accept the result or agree with the reasoning of the court. The majority, in relieving defendant of his plea of guilty to manslaughter in the first degree, disregards no less than three separate, well-established lines of authority, at least five direct precedents, not to mention the salient facts contained in the record. In my view, the application of settled rules of law to the circumstances of this case leads irresistibly to the conclusion that the defendant’s right to counsel was in no respect abridged. Moreover, any error in the refusal to suppress the stenographic statement should be considered harmless error.
The facts are undisputed. On January 19, 1971, five men attempted to rob a liquor store in Manhattan and, in the course of events, the store owner was shot and killed. Defendant Willie Ramos was charged with complicity in the homicide and a warrant was issued for his arrest. Several months later, on August 10, 1971, one Adalberto Santiago was arrested in Bronx County for the possession of narcotics. The next morning the police received information that Santiago was, in fact, Ramos and narcotics officers were sent to interview Santiago prior to his arraignment on the narcotics charges. Upon arrival at the holding pens in the Criminal Courts Building, the officers asked the jailer whether they could speak to Santiago who they believed to be Ramos. The defendant came to the gate on the holding pen and was asked: "Is your real name Willie Ramos?” The defendant admitted that it was. The officers received permission from the guard to speak to the defendant privately in another room. The defendant was brought into the room and the officers asked him whether he knew about a homicide that occurred in upper Manhattan. The defendant answered, "Yes. It wasn’t me, it was Hector that did it all.” The officers immediately interrupted the *620 defendant and advised him of his constitutional rights. After waiving his rights, defendant gave a detailed and incriminating account of the attempted robbery. The defendant stated that he was accompanying a friend who had told him that they were going to collect a debt. Since this friend expected trouble, he gave the defendant a weapon. Before they reached the supposed destination, the men stopped off to purchase some liquor. One of the other men announced that "this is a stick-up”. When the proprietor began shooting at the robbers, defendant pulled out his weapon and fired it several times at the store owner. The men returned to the get-away car and drove off.
After he made his statement, the defendant was returned to the detention pen. The narcotics officers advised the homicide investigation unit in Manhattan of the results of their interview with Ramos. Detective Edward Bulger was assigned to meet the narcotics officers at the courthouse and take the defendant into custody after his arraignment on the drug charges.
Defendant was arraigned at approximately 2:00 p.m. that afternoon.* The court granted the bail application of a co-defendant but, since it had been presented with an arrest warrant for "Santiago, also known as William A. Ramos” in connection with the homicide, the court placed the defendant in the custody of Detective Bulger. The attorney retained to represent defendant on the narcotics charges stated, for the record, "I have advised Mr. Santiago not to make any statements to these police officers who are taking him into custody.” Detective Bulger did not interrogate the defendant.
Later that day, Detective Thomas McKenna escorted Ramos to the office of the New York County District Attorney where he was interviewed by an Assistant District Attorney. Ramos, after being advised of his constitutional rights, agreed to discuss the shooting with the prosecutor. Although at one point Ramos expressed a desire to consult with a lawyer, his co-operation was predicated on the fact that he had already made admissions to the narcotics detectives. "I already talked to detectives, if they got that record already it don’t make no difference.” The defendant proceeded to give a stenograph *621 ically recorded account of the attempted robbery and homicide. Thereafter, on September 9, 1971, defendant was charged in an indictment with two counts of murder, attempted robbery in the first degree and possession of a weapon as a felony.
Before trial, defendant moved to suppress the statements he had made to the arresting officers and to the Assistant District Attorney. After a hearing, the trial court denied the motion. The court found that, although defendant was represented by an attorney with respect to the narcotics case, "that representation did not extend in any way to the homicide which was then under investigation and concerning which judicial proceeding had not yet been undertaken.” The court also concluded that the prosecutor had not attempted to deceive the defendant into waiving his right to counsel and that the statements of the Assistant District Attorney were not "a factor in persuading the defendant to waive his rights and make a statement.” Rather, "[t]he record and testimony makes clear that at the time he was questioned by the assistant district attorney he was eager to make a statement, or explanation to someone in authority, in an effort to exculpate himself or to mitigate his involvement in the charges which were confronting him.” In addition, the court found that the statements were entirely voluntary and that "at no time did the defendant actually ask for an attorney.”
After a trial jury had been selected and evidence presented, the defendant agreed to plead guilty to a reduced charge of manslaughter in the first degree. At the time of plea, the defendant was aware that the prosecutor would recommend that the court impose the maximum sentence of 8 Vs years to 25 years. Prior to accepting the plea, the court conducted an extensive inquiry and defendant once again admitted that he shot the liquor store owner after the owner had fired at his assailants.
At the time of sentence, defendant moved to vacate his plea. This motion was predicated upon the assertion that defendant pleaded guilty because of the testimony of his alleged accomplices and "for the sake of expediency”. Defendant stated that he had been frightened of going to jail for "the eight to twenty-five. I got a family. I got kids, you know.” After a review of the plea inquiry, the court concluded that defendant’s statements to the court were "in no way anything but voluntary”. The court took into consideration that a jury had already been impaneled and that the defendant had been *622 facing a possible conviction for murder. The Appellate Division unanimously affirmed the judgment of conviction. (48 AD2d 1014.)
The principal issue before us is whether the defendant’s right to counsel was abridged by the taking of an incriminating statement by the Assistant District Attorney in the absence of counsel. The majority concludes that the defendant’s right was violated since the defendant had been represented by counsel at his arraignment on the narcotics charge and this attorney had advised the defendant not to make any statements to the police. In my view, this conclusion is not supported by the authorities or by the facts in the record.
Over the years, our court has developed two discrete rules which limit the right of the police to obtain incriminating statements from defendants or suspects in the absence of counsel. The "post-arraignment, post-indictment” rule was the first to emerge. An incriminating statement made after arraignment or indictment and in the absence of counsel is inadmissible. (People v Di Biasi, 7 NY2d 544, 550-551; People v Waterman, 9 NY2d 561, 565.) This rule was predicated on a defendant’s right to counsel from the time that a criminal action has been formally instituted. (People v Waterman, 9 NY2d 561, 566, supra; Richardson, Evidence [10th ed], § 547, p 549.) The postarraignment, postindictment rule has survived Miranda v Arizona (384 US 436) and exists, as a matter of State constitutional law, independently of any rights defendant may have under the Federal Constitution. However, it was early held that "the mere fact that the defendant has been arraigned or indicted on one charge does not prevent law-enforcement officials from interrogating him, in the absence of an attorney, about another and different crime—upon which he has been neither arraigned nor indicted—or render inadmissible a confession or other inculpatory statement obtained as a result of such questioning.” (People v Stanley, 15 NY2d 30, 32-33 [Fuld, J.], cert dsmd 382 US 802.) This limitation was based on the fact that no criminal proceeding had yet been commenced with respect to the second crime. Implicit in Stanley is the recognition that defendant had a right to counsel flowing from the arraignment on the first charge and that any representation with respect to the original charge might not have yet terminated.
The second rule, developed in People v Donovan (13 NY2d 148) and People v Arthur (22 NY2d 325) forbids police interro *623 gation with respect to criminal charges where defendant is represented by counsel in connection with those charges. "Once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant’s right to counsel (People v. Vella, 21 NY 2d 249). There is no requirement that the attorney or the defendant request the police to respect this right of the defendant.” (People v Arthur, 22 NY2d 325, 329, supra.) To trigger the application of the Donovan-Arthur rule, the attorney must be representing the defendant in connection with the specific criminal charges under investigation. (People v Hobson, 39 NY2d 479, 481, 483.) That the defendant may have been represented by some attorney in an unrelated case at some point in the past is insufficient. (People v Hetherington, 27 NY2d 242, 245; People v Delle Rose, 27 NY2d 882, cert den 402 US 913.)
The rule makes eminent sense. The object of the Donovan-Arthur rules is to prohibit the State from interfering with the attorney-client relationship by interrogating the client with respect to matters encompassed by the representation in the absence of the attorney. If, however, the subject matter of the interrogation is outside the scope of counsel’s involvement with the case, there can be no interference with the relationship between attorney and client for the representation of the attorney did not extend that far. Of course, there may be unusual situations where lines of demarcation cannot be easily drawn. For example, defendants charged with several unrelated crimes may have the same lawyer each time. Similarly, indigent defendants may always be represented by the Legal Aid Society. Whatever the rules with respect to these situations, the point here is that this case involves privately retained counsel on the robbery charge in one county and other counsel on the murder charge in another county.
People v Taylor (27 NY2d 327), relied upon by the trial court, is directly on point and presents a virtually identical fact pattern. The police were investigating a homicide that was committed in the course of a robbery and learned that three persons had been arrested for a robbery with a similar modus operandi. An officer went to the detention center and, after alerting one of the defendants to the second robbery as to the topic of his investigation and advising her of her constitutional rights, interviewed her with respect to the *624 robbery-homicide. She made incriminating statements and repeated them to an Assistant District Attorney. Two other defendants were brought before the prosecutor and gave incriminating statements. Relying upon Stanley and Hetherington, we concluded that neither the postarraignment rule nor the Donovan-Arthur rule had been violated. The court emphasized that "the thrust of our prior decisions is that once the police learn that an attorney has entered the proceeding, it is offensive to our system of justice, in the absence of a waiver, to permit further questioning by representatives of the People. Implicit in this rationale is the concept that the rule does not obtain unless and until the police or prosecutor learn that an attorney has been secured to assist the accused in defending against the speciñc charges for which he is held. It is, therefore, of no consequence that the law enforcement officials involved herein learned that an attorney had been assigned at the arraignment on the robbery charge since this attorney was in no way connected with the instant criminal proceeding.” (27 NY2d, at p 332 [emphasis in original].)
It is my view that Taylor, as well as Stanley, Hetherington, and the very statement of the pertinent rules contained in Hobson and Arthur, control the disposition of this appeal. Defendant, at the time he was questioned by the prosecutor, had not been arraigned or indicted on the murder charge. The attorney who represented defendant at the arraignment on the narcotics charge had not entered into the criminal proceeding with respect to the murders The trial court so found and the Appellate Division affirmed this finding. Not only did this attorney represent defendant on another charge in another county, he represented this defendant under another name. The lawyer was retained to represent Adalberto Santiago in connection with a charge of narcotics possession in The Bronx, not to defend Willie Ramos from a charge of murder in New York County.
The majority, perceiving that there was no relation between the narcotics charge and the murder investigation, contends that the attorney who represented defendant at the narcotics arraignment entered the proceeding by warning the defendant not to make statements to the police (p 617). From this the court deduces an "affirmative act” sufficient to indicate "that the attorney [had] undertaken to represent the accused with respect to the second, unrelated crime” (p 616). This, in my view, is extremely strained. The attorney’s comment, made *625 out of an abundance of caution, was entirely unnecessary and utterly irrelevant since there is no requirement that the attorney or defendant affirmatively request the police to respect defendant’s right to counsel. (People v Arthur, 22 NY2d 325, 329, supra.) Moreover, the majority errs when it states that this statement had reference to an "interrogation which was about to be commenced in connection with the liquor store shooting” (p 617). The interview with the prosecutor was not "about to be commenced”, it did not occur until several hours later. When the interview did take place, it was conducted by the prosecutor and not by any of the "police officers who are taking [defendant] into custody.” Indeed, the officer to whom the warning was addressed did not interrogate the defendant and was, in fact, off duty when the subsequent interview was conducted. But even more importantly, I find it astounding that the rendition of such obvious and brief advice as not to make statements to the police can snowball into a conclusion that the attorney on the drug charge thereby agreed to represent the defendant on the unrelated murder charge. As a matter of fact, the record is completely to the contrary, the attorney on the drug charge never appeared for the defendant on the unrelated murder charge. The inaction of this attorney speaks even more loudly than his words. The attorney never appeared for the defendant in connection with the murder charge—the defendant was represented throughout the proceedings pertaining to this charge by other counsel. Thus, the majority’s attempt to distinguish Taylor on its facts is, in my view, unpersuasive.
As for the alleged ineffectiveness of defendant’s waiver of his right to counsel (p 618), it suffices to state that the trial court, after an extensive hearing at which the prosecutor testified, found that the waiver had not been procured by either deceit or coercion. Indeed, the trial court found that defendant had willingly discussed the details of the murder with the prosecutor in an effort to establish mitigating circumstances. Reliance on the bare wording of the long-cold transcript is, in my view, misplaced, since, as is plain, the words of the transcript cannot convey to us the nature of the atmosphere in the prosecutor’s office. Whether the prosecutor had attempted to coerce the defendant into confessing without counsel cannot be determined in this case, as a matter of law, from the prosecutor’s words alone. It is important to consider the manner in which those words were conveyed to the *626 defendant and to consider the defendant’s apparent state of mind upon hearing the words. I find it peculiar that findings of fact which are freely bandied about in other contexts are now tossed aside in favor of a transcript which, in my view, is, at best, equivocal in nature.
Regrettable also is the majority’s implication that an erreonous denial of a motion to suppress admissions should only rarely be considered harmless error. While the Criminal Procedure Law specifically provides that the denial of a motion to suppress evidence may be reviewed on appeal from a judgment of conviction, even if the judgment resulted from a plea of guilty (CPL 710.70, subd 2), the appeal quite obviously must be taken and considered in accordance with the criminal appeal provisions contained in another chapter of the Criminal Procedure Law. One of the foremost of these statutory requirements is that the appellate courts determine appeals without regard to technical errors or defects which do not affect the substantial rights of the parties. (CPL 470.05, subd 1.) Since both the postarraignment, postindictment rule and the Donovan-Arthur rule have their origins in provisions of our State Constitution, the appellate courts must in this circumstance apply the test for constitutional error, namely, that there is no reasonable possibility that the error may have contributed to defendant’s conviction and that it was thus harmless beyond a reasonable doubt. (People v Crimmins, 36 NY2d 230, 237; Chapman v California, 386 US 18, 24.)
Where crucial self incriminating evidence was erroneously placed before a trial jury or where a defendant’s guilty plea resulted from an erroneous denial of his suppression motion, such error would not, ordinarily, be harmless beyond a reasonable doubt. However, neither situation is present in this case. Naturally, it would be difficult for an appellate court to assess the impact that suppressible self incriminating testimony had upon the jury. For this reason, we may not speculate as to whether the jury would have returned the same verdict if the evidence had been excluded. Similarly, where the defendant has pleaded guilty and the record is silent as to his motivation for doing so, it would be impossible to state that the guilty plea was not prompted or, at least, significantly influenced by the erroneous denial of the motion to suppress. (See People v Hobson, 39 NY2d 479, supra.) However, in recent years, guilty pleas are seldom accepted on barren records. Rather, the trial courts have been required to conduct inquiries into the under *627 lying basis for the offering of a plea of guilty in order to ascertain that the plea was offered voluntarily with full knowledge of its consequences and with an acknowledgment of guilt. (See People v Serrano, 15 NY2d 304; North Carolina v Alford, 400 US 25.) Where the hearing record establishes beyond doubt that other considerations entirely apart from the decision on the suppression motion have formed the basis for the plea, the fact that the decision was erroneous is of no real consequence. The record in this case establishes that the defendant pleaded guilty, in a plea-bargain, only after it appeared to him that the testimony of his accomplices would be sufficient to convict him of murder. Indeed, his earlier oral admission to the narcotics detectives was not challenged and would also be placed before the jury. At no time did defendant mention or even allude to the earlier denial of his suppression motion or to the self incriminating statements that would be admitted into evidence. Even assuming that the stenographic transcript should have been suppressed, the record establishes that the trial court’s determination on that matter played absolutely no role in defendant’s formulation of his decision to plead guilty. Defendant’s plea to a reduced charge was offered in an effort to minimize the punishment to be imposed for the murder he admitted and for which he feared conviction and a long sentence. The statement in the majority opinion to the effect that the confession was a "likely factor which might have induced the plea” (p 619) is inexplicable, given the strong proof in the record to the contrary. That the confession might have affected a verdict upon trial is irrelevant since the defendant, fearing the result of that trial, pleaded guilty and the trial was aborted. Indeed, there was much other evidence that would have resulted in a guilty verdict. Hence, the defendant, in electing to plead guilty, was understandably concerned with the inevitability of a murder conviction since he was confronted with a series of unchallenged admissions, the testimony of his accomplices, as well as other proof of his guilt. The second series of admissions, the ones made to the prosecutor and deemed suppressible by the majority, were but a ripple in a rather large sea of proof. It is pointless to throw a rope to a man drowning in his own guilt.
The defendant’s motion to vacate his plea was also based upon a different ground—i.e., defendant’s alleged fear of going to jail. In rejecting this contention, the trial court properly noted that defendant voluntarily accepted the plea-bargained *628 compromise, with full knowledge that the prosecutor would recommend the imposition of a maximum jail sentence. The trial court also considered the fact that the People had already begun to place their proof before a jury and that defendant, unhappy with the tenor of the trial, elected to plead guilty and abort the trial. (People v Friedman, 39 NY2d 463, 467.) Defendant even now can point to no facts which make the plea unjust. (People v Nixon, 21 NY2d 338, 355-356.) Under all of these circumstances, any error with respect to the stenographic transcript was quite harmless since there can be no doubt, not even an unreasonable doubt, that it had no effect on defendant’s plea of guilty and on the resulting judgment of conviction. Indeed the majority does not argue to the contrary. The plea should stand. (See People v Selikoff, 35 NY2d 227.) I would hold any error on the suppression motion harmless, not simply because the proof was overwhelming, which it was, but because the record establishes that the denial of the motion to suppress was in no respect a producing or contributing cause of the guilty plea.
In my view, the court’s decision today is not in the best interests of justice. The defendant had accepted a plea-bargain and then recanted for reasons which played no role in the offering of the plea. Now, nearly four years after the plea to a lesser charge, defendant has won the opportunity for a new trial. In the meantime, witnesses probably have disappeared, memories have faded and the prosecution’s case has been weakened. The practical likelihood is that defendant has increased his chances of avoiding a conviction and has gained the chance to strike an even better plea-bargain than the one he originally accepted.
The process of the criminal law is a process for searching out the truth and finding, hopefully, justice. In this case, defendant short-circuited that process by admitting his guilt on the record and voluntarily pleading guilty. The argument that an irrelevant error should undo a truthful and voluntary judicial admission of guilt, and, hence, a judgment of conviction, does not, in my view, advance the cause of justice very far. Perhaps it is a reflection on the state of our society that the essence of justice is so often lost in a miasma of impracticality. While it may be that hard cases make bad law, it might also be safely said that the occasional easy case makes law that is even worse.
In sum, the principles established in Stanley and the postar *629 raignment, postindictment rule cases, in Taylor and the line of authority emanating from Donovan and Arthur, as well as the harmless error rule imposed by statute, call for an affirmance. All of these precedents "reflect principle and doctrine rationally evolved”, requiring application of stare decisis. (People v Hobson, 39 NY2d 479, 488, supra.) The court also passes over a finding of fact, that an attorney had not entered the murder proceeding, which was affirmed by the Appellate Division.
For these reasons, I am compelled to dissent.
Chief Judge Breitel and Judges Gabrielli, Jones, Fuchs-berg and Cooke concur with Judge Wachtler; Judge Jasen dissents and votes to affirm in a separate opinion.
Order reversed, etc.

 The record indicates that the court had started to arraign the defendant at an earlier time but that the case had to be postponed so that an interpreter could be secured. It is unclear whether the earlier attempt preceded defendant’s interview with the narcotics officers which took place at approximately 11:30 a.m.